IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| and | ) NO. CIV 00-1872 PHX MHM ) |
| SAM DARMO, AMER DARMO and SAMUEL EINHORN, | ) ) ) |
| Intervenors, | ) ) |
| vs. | ) ) |
| PINNACLE NISSAN, INC., | ) ) |
| Defendant. | ) ) |

Phoenix, Arizona
April 25, 2001
9 a.m.

VIDEOTAPED DEPOSITION OF ORLANDO SANTOS GARCIA
(Volume I, Pages 1 through 160, inclusive.)

REPORTED BY:
Carrie Smalanskas, RPR, CCR
Certified Court Reporter
CCR No. 50355

HOLIDAY & ASSOCIATES
Registered Professional Reporters
2025 North Third Street, Suite B-173
Phoenix, Arizona  85004
(602) 712-9700



EXHIBIT
D

5        Q.    And who took that witness interview?

6        A.    Ms. Lori Barreras.

7        Q.    And why did you record that?

8        A.    I recorded that because it had not been

9 recorded previously.

10       Q.    When did you record that?

11       A.    When I was putting the file together.

12       Q.    And when was that?

13       A.    I would say when the file was going in

14 for a recommendation.

15       Q.    And when would that have been?

16       A.    I can't tell.

17       Q.    I am not sure I understand what you mean

18 by "can't tell." You can't tell from this log --

19       A.    No.

20       Q.    -- when that occurred?

21            If we go to the second page of the log,

22 is there anything on there that indicates when that

23 would have occurred?

24       A.    It would have been sometime after the

25 last notation, which is dated 9/22/99.

56

1       Q.    And obviously sometime prior to when the

2 recommendation itself is dated?

3          A.      Yes.

4          Q.      So are you saying that you entered all of

5     these items that are dated between 3/31/99 and 9/23/99

6     at the same time?

7          A.      Yes.

8          Q.      That is not the way the log is supposed

9     to be prepared, is it?

10         A.      There is no set procedure for it.

11         Q.      Are you certain of that statement?

12         A.      Yes.

13         Q.      And so it would be a surprise to you if

14    the compliance manual indicates that events in an

15    investigation are to be recorded in the log at the time

16    that they occur?

17                 MS. SHANLEY:   Objection, asked and

18    answered.

19         Q.      BY MS. FRANZE:  Would that be a surprise

20    to you?

21         A.      No.

22         Q.      In fact, that is the instructions that

23    investigators receive, isn't it?

24         A.      Probably.

25         Q.      Investigators also receive instructions

1  that they are to record the activities that they

2  themselves perform on the log; isn't that correct?

3       A.    I don't know.

4       Q.    Do you have any reason to doubt that

5  statement?

6       A.    Don't know.

7       Q.    Does it make sense to you that the person

8  who has firsthand knowledge of the event being recorded

9  would be the one to record the event in the log?

10      A.    Can you say that again?

11      Q.    Does it make sense to you that the person

12 who has firsthand knowledge of the event being recorded

13 would be the one to record it in the log?

14      A.    Yes.

15      Q.    But in this case, in fact, you recorded

16 events that you were not involved in; is that correct?

17      A.    That is correct.

18      Q.    Did you record those events at someone's

19 instructions?

20      A.    No.

21      Q.    You did it on your own?

22      A.    Yes.

23      Q.    Why did you do that?

24      A.    Because we have to record the actions

25 into the case log.

1      Q.      Are you saying because you have to turn

2    in a completed log at the time you make a

3    recommendation?

4      A.      Yes, we do.

5      Q.      So at this point in time, sometime after

6    September of 1999, you set about to reconstruct what

7    the log should look like; is that correct?

8      A.      When you say "reconstruct," what do you

9    mean?

10      Q.      Well, you were recording events that

11    purportedly occurred on 3/31/1999, 4/1/1999, and on

12    numerous dates between March 1999 and September 1999

13    after they had actually occurred; isn't that correct?

14      A.      Yes.

15      Q.      And you were attempting to reconstruct

16    what had occurred; is that correct?

17      A.      I am just logging in what the case file

18    has inside the file.

19      Q.      Was it your intent to accurately record

20    what had occurred in this investigation?

21      A.      Yes.

22      Q.      And you were attempting to accurately

23    record what had occurred based upon the file that you

24    had; is that correct?

25      A.      Yes.

1          Q.       Did you have any other information in

2     constructing this case log?

3          A.       When you say "any other information" --

4          Q.       Other than the file, were you relying on

5     any other information when you set about to construct

6     this case log?

7          A.       No.

8                   MS. SHANLEY:  Would this be a good time

9     for a short break?

10                  MS. FRANZE:  Sure.

11                  VIDEO TECHNICIAN:  Off the record at

12    10:43 a.m.

13                  (Off the record.)

14                  VIDEO TECHNICIAN:  Back on the record at

15    10:51 a.m.  This is the end of videotape No. 1.

16                  Off the record at 10:51 a.m.

17                  (Off the record.)

18                  VIDEO TECHNICIAN:  Back on the record at

19    10:54 a.m.  This is the beginning of videotape No. 2.

20         Q.       BY MS. FRANZE:  Mr. Garcia, before we

21    broke, we were discussing EEOC Bates stamp No. 1 and

22    No. 2, which constitute the log for the charge of Amer

23    Darmo.

24                  You indicated that the entry that is

25    written at 12/10/98 was written by Lori Barreras.  Do

5          A.      Is that what your question means?

6          Q.      Well, I have asked you what documents

7     either were prepared or, in fact, came to your

8     attention between those two dates that could support

9     the amended determination?

10         A.      Well, right now, I am holding the

11    document for the notes that I indicated earlier, and

12    that would be EEOC-PN 000090 and 000091.  As far as the

13    retaliation, that's one of the documents.

14         Q.      These are the notes you referred to

15    earlier as one of the three items that represented

16    facts that caused the amended determination, correct?

17         A.      That is one that I just found, yes.

18         Q.      Is that correct?

19         A.      Yes.

20         Q.      And you have referred to EEOC 90 through

21    91.  These are actually typewritten notes that are

22    internally dated August 16, 1999, correct?

23         A.      Correct.

24         Q.      And that would have been after the

25    initial determination -- I am sorry, that would have

99

1     been before the initial determination, correct?

2          A.      Correct.

3        Q.      Anything else?

4        A.      I am still looking through the file.

5        Q.      Mr. Garcia, we have produced to you, as

6   we previously represented, the exact production that

7   was made by the EEOC in this case, and I think what has

8   been previously identified as the Amer Darmo file EEOC

9   1 through 580 --

10       A.      Okay.

11       Q.      -- in the exact order that it was

12  produced.  You seem to be having a lot of trouble

13  moving through the file.  Is that file organized in any

14  way that you are not used to?

15       A.      This is not the way I organized the file,

16  so...

17       Q.      How did you have the file organized?

18       A.      The way we have the file organized is the

19  first part of the file has the charge, the notice of

20  charge.  Then the next part is documents provided by

21  the charging party.  Then the next part of the file

22  generally would be any documents that the respondent

23  has provided, and then the last part is usually

24  information from witnesses.

25       Q.      And within those categories that you just

100

1    listed, would the order be chronological; in other

2    words, in order of date?

3         A.    Yes.

4         Q.    And that would be the way that you were

5    taught to keep the file at the EEOC?

6         A.    That is correct.

7         Q.    And that is not the way this file

8    appears, is it?

9         A.    It doesn't look that way.

10        Q.    And can you discern any order whatsoever

11   in this file?

12        A.    No, I -- no.  It starts with the

13   determination and goes to letters written to reconsider

14   the determination.  Then it goes into some other

15   documents, some notes and witness letters, and that

16   sort of thing.

17        Q.    Do those other documents appear to be in

18   any kind of order to you?

19        A.    Not in the order that I am comfortable

20   with as far as the way I keep my files, so...

21        Q.    And if this file had been produced in a

22   way that you normally kept the file, you would have an

23   easier time moving through it; is that correct?

24        A.    That is correct.

25        Q.    And it would have taken a lot less time

1    for you to find the documents that we have been trying

2    to search for today; is that correct?

3          A.      That is correct.

4          Q.      And, in fact, in terms of dated

5    documents, you would have been able to move right to

6    that section and find the date in chronological order;

7    is that correct?

8          A.      That is correct.

9          Q.      Do you have any idea why the file is in

10   the order that it is in?

11               MS. SHANLEY:   Objection.   Calls for

12   speculation.

13         A.      No, I don't.

14         Q.      BY MS. FRANZE:   Have you ever seen an

15   EEOC file in the order that this one has been produced?

16         A.      No, I haven't.

17         Q.      And in your 10 years as an EEOC

18   investigator, you have never seen an EEOC file produced

19   in this format?

20         A.      No.

21               Can I continue to --

22         Q.      Yes, please.

23               MS. SHANLEY:   Do you want to take a lunch

24   break and finish this after lunch, or do you want him

25   to go through the rest of the file first?

2      on-site?

3            A.      No.

4            Q.      You will agree with me that not all

5      current employees were interviewed at the on-site,

6      correct?

7            A.      Can you repeat that, please?

8            Q.      You will agree with me that not all

9      current employees were interviewed at the on-site?

10           A.      Correct.

11           Q.      In fact, relatively few of the then

12     current employees were interviewed at the on-site,

13     correct?

14           A.      When you say "relatively few," what do

15     you mean?

16           Q.      Well, let's say less than 20 percent of

17     the employees of Pinnacle Nissan were interviewed at

18     the on-site?

19           A.      I can't make that judgment call on that

20     because I don't know how many employees they would have

21     had at that time.

22           Q.      So you just have no knowledge whatsoever?

23           A.      As far as the number of employees, no.

24           Q.      But it wouldn't surprise you to find that

25     the majority of employees who were then working at

1    Pinnacle were not interviewed at the on-site, correct?

2            MS. SHANLEY:  Objection.  Calls for

3    speculation.

4        Q.    BY MS. FRANZE:  Go ahead and answer.

5        A.    I don't know.

6        Q.    And if you had wanted to know at this

7    time period the proportion of the employees interviewed

8    at the on-site, you could have asked Ms. Barreras,

9    correct?

10       A.    Correct.

11       Q.    But you did not do that, correct?

12       A.    No.

13       Q.    Isn't it also true that Ms. Barreras also

14   interviewed those employees that the charging parties

15   identified for her at the on-site?

16       A.    Can you repeat that question?

17       Q.    Isn't it true that Ms. Barreras

18   interviewed all of the employees who were then employed

19   at Pinnacle identified by the charging parties?

20           MS. SHANLEY:  Objection, lack of personal

21   knowledge.

22       A.    What was reflected in the file?

23       Q.    BY MS. FRANZE:  Doesn't the file indicate

24   that Ms. Barreras interviewed those witnesses

25   identified by the charging parties?

144

1       A.      I would have to compare that to what the

2   charging parties identified as witnesses and compare it

3   to Ms. Barreras's interview to answer that question

4   properly.

5       Q.      Would you agree with me that you or

6   Ms. Barreras interviewed, to the extent that you could

7   find them, every person that the charging parties asked

8   you to interview?

9       A.      That, I can't recall.

10      Q.      It could be a true statement; you just

11  don't know?

12      A.      Right.

13      Q.      Now, I take it, since you indicated that

14  201 through 205 constitutes all employees who were

15  terminated during the applicable time period, that this

16  list did not come from the charging parties, correct?

17      A.      That is correct.

18      Q.      And that, for whatever reason, you made

19  the decision as an experienced investigator to make

20  contact with all terminated employees of Pinnacle

21  Nissan, correct?

22      A.      Correct.

23      Q.      And you also made the decision to do that

24  at the exclusion of current employees of Pinnacle

25  Nissan, correct?

145

1      A.      Correct.

2      Q.      And the reason that you did that is that

3  you believed that terminated employees would have an

4  axe to grind with Pinnacle Nissan; isn't that correct?

5           MS. SHANLEY:  Objection, misstates his

6  testimony.

7      Q.      BY MS. FRANZE:  Isn't that a correct

8  statement?

9      A.      I never said that.

10     Q.      Isn't it true that you believed that

11  terminated employees would more likely as a group have

12  something negative to say about Pinnacle Nissan and

13  that was your goal in sending out the letters?  Isn't

14  that true?

15     A.      No.

16     Q.      Does it surprise you at all that

17  terminated employees, in general, may have more

18  negative things to say about ex-employers than current

19  employees have to say?

20           MS. SHANLEY:  Objection, asks for

21  speculation.

22     Q.      BY MS. FRANZE:  As an experienced

23  investigator for the Equal Employment Opportunity

24  Commission, the largest investigator of employment

25      disputes in this country, does it surprise you that

                                                          146

1    ex-employees are often disgruntled employees?

2          A.     I can't answer that.

3          Q.     Isn't it true that as of the time that

4    you prepared the list that constitutes 201 through 205

5    that you, in effect, were no longer acting as a neutral

6    investigator but were gathering evidence in order to

7    prosecute a case?

8          A.     That is not true.

9          Q.     Okay.  Tell me what, if anything, you did

10   to find evidence that might support Pinnacle Nissan's

11   version of the events in this case?

12         A.     Can you repeat that question, please?

13         Q.     Tell me what, if anything, you did as an

14   experienced investigator for the EEOC to determine what

15   evidence existed to support Pinnacle Nissan's version

16   of the events in this case.

17         A.     Just sending the letters out, and if

18   something came back, then that would be the evidence

19   submitted.

20         Q.     And the letters that you are referring to

21   are the letters to the disgruntled ex-employees listed

22   on pages 201 through 205, correct?

23          MS. SHANLEY:  Object to the form of the

24   question.

25          Q.    BY MS. FRANZE:  Go ahead and answer.

                                                          147

1          A.    Can you repeat that question, please?

2          Q.    The letters that you referred to as being

3    your efforts to verify information submitted by

4    Pinnacle Nissan constituted letters to employees no

5    longer working for Pinnacle Nissan, terminated

6    employees, listed on page 201 through 205, correct?

7          MS. SHANLEY:  I am going to object to the

8    form of the question in that I believe we are using the

9    word "terminated" in two different manners.  I believe

10   Mr. Garcia did not use terminated.  He used those who

11   were no longer employed.  There is a difference.

12         Q.    BY MS. FRANZE:  Mr. Garcia, can you take

13   a look at the heading on page 201?

14         A.    Yes.

15         Q.    I think there is a word there, and I

16   believe it to say "terminated."  Does it say

17   "terminated"?

18         A.    It says "terminated."

19         Q.    Is that something you wrote there?

20         A.    Yes.

21          Q.       And afterwards there in a parenthetical

22    is the word "employees"?

23          A.       Yes.

24          Q.       And, in fact, the word "terminated" is

25    underlined?

                                                        148

1           A.       Yes.

2           Q.       And you believed that the list that now

3     is included on pages EEOC 201 through 205 constitutes a

4     list of terminated employees from Pinnacle Nissan,

5     correct?

6           A.       Yes.

7           Q.       And up in the left-hand corner with a

8     check mark there is another underlined statement that

9     says "letter issued"?

10          A.       Yes.

11          Q.       And this indicates people that -- all the

12    people on this list received a letter from you,

13    correct?

14          A.       I can't say that with certainty.

15          Q.       Okay.  Let me rephrase that.

16                   All the people on this list, you sent a

17    letter to at the address indicated; is that correct?

18          A.       I can't say that either.

19      Q.      Okay.  Well, which people on this list

20  did you send letters to?  Maybe I misunderstood your

21  testimony.

22      A.      Well, I see Mark Kevin Doinidis is one

23  and a John Edward Demsky.

24      Q.      I misunderstood your testimony, but is

25  there another list that indicates to whom you sent a

149

1   letter?

2       A.      There is no list ever indicating of who I

3   sent the letter to.

4       Q.      So I am confused then.  Why does this

5   document say "letter issued" on it?

6       A.      That is to remind me that if I put a

7   check, then I sent the letter.  It may have come back;

8   it may not have.  But I don't know which individuals

9   were sent letters or not.

10      Q.      I am not sure I understand.  Are you

11  saying that there is no record concerning who you sent

12  letters to?

13      A.      I don't know that, unless I look into the

14  file.

15      Q.      And in order to tell us that, you would

16  have to look through, again, 580 documents just from

17    Mr. Amer Darmo's file?

18        A.    Yes.

19        Q.    A like number of documents for

20    Mr. Sam Darmo's file, and a like number of documents

21    for Mr. Sam Einhorn's file; is that correct?

22        A.    That is correct.

23        Q.    And that would take you some period of

24    time, correct?

25        A.    Correct.


                                                    150


1          Q.    So if I understood you correctly, the

2    purpose of your handwriting this list was in order to

3    send letters to terminated employees, but you are not

4    certain if you actually sent letters to all of them?

5          A.    Due to when I was investigating the case

6    file to now, I can't be sure of who may have been

7    issued letters or not.

8          Q.    But was my statement correct, that the

9    purpose of your preparation of this list, 201 through

10    205, which seems to have about 123 names on it, was

11    preparatory to sending letters to terminated employees

12    of Pinnacle Nissan?

13        A.    Yes.

14        Q.    And your testimony is that you, in fact,

304

```
 1   STATE OF ARIZONA          )
                               )   ss.
 2   COUNTY OF MARICOPA        )

 3        BE IT KNOWN that the foregoing deposition was

 4   taken before me, Carrie Smalanskas, a Certified Court

 5   Reporter in and for the County of Maricopa, State of

 6   Arizona; that the witness before testifying was duly

 7   sworn by me to testify to the whole truth; that the

 8   questions propounded to the witness and the answers of

 9   the witness thereto were taken down by me in shorthand

10   and thereafter reduced by computer-aided transcription

11   to print under my direction; that the deposition was

12   submitted to the witness to read and sign; that the

13   foregoing 71 pages are a true and correct transcript of

14   all proceedings had upon taking of said deposition, all

15   done to the best of my skill and ability.

16        I FURTHER CERTIFY that I am in no way related to

17   any of the parties hereto nor am I in any way

18   interested in the outcome hereof.

19        DATED at Phoenix, Arizona, this 16th day of

20   May, 2001.

21

22                         Carrie Smalanskas, RPR, CCR

23

24
     Certified Court Reporter
25   CCR No. 50355
```